IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 13-00147-01-CR-W-DW |
| KENNETH A. WALENTY, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is Defendant's Motion to Suppress Evidence.[1] Defendant moves the Court to suppress all evidence recovered from a March 25, 2013, search of his residence. For the following reasons, Defendant's motion should be granted in part and denied in part.

### *I. BACKGROUND*

On April 23, 2013, an indictment was returned charging Defendant with one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A) and 846, three counts of distribution of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and one count of possession with the intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B).

On July 21, 2013, Defendant filed a motion to suppress (Doc. No. 23). The Government responded to Defendant's motion on August 12, 2013 (Doc. No. 29). I conducted an evidentiary

---

[1] Defendant's motion also seeks to suppress statements he made while in custody in response to questions about drugs or other contraband, as he had not been Mirandized (Doc. No. 23, p. 4). Because the Government does not intend to offer these statements into evidence during trial (Doc. No. 29, p. 11), analysis is not necessary.

1

hearing on September 10, 2013. The government appeared by Assistant United States Attorney Catherine Connelly. Defendant was present, represented by retained counsel John Lozano. The government called the following witnesses to testify: (1) DEA Special Agent Brittany Ziesman-Hicks; and (2) DEA Special Agent Doug Dorley. The parties stipulated to the content of the search warrant application as the testimony of Agent Ziesman-Hicks (Tr. at 3; Gvt. Exh. 1). The following exhibits were admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Search and Seizure Warrant and Application |
| Government's Exhibit 2: | 04/02/13 Report of Investigation |
| Government's Exhibit 3: | Search and Seizure Warrant Return |
| Defendant's Exhibit 4: | Missouri Highway Patrol Confidential Narcotics Report |

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.

1. In January of 2013, Special Agent Ziesman-Hicks initiated an investigation of Defendant utilizing a confidential source who had proven to be reliable (Gvt. Exh. 1; Tr. at 5). The confidential source stated Defendant was a large scale distributer/supplier of crystal methamphetamine and obtained/distributed approximately six pounds of crystal methamphetamine per week (Gvt. Exh. 1; Tr. at 5). The confidential source had observed large quantities of crystal methamphetamine in Tupperware containers and backpacks (Gvt. Exh. 1). The confidential source further stated that he/she believed Defendant "cleaned" his drug proceeds through area casinos (Gvt. Exh. 1).

2. Through a series of text messages and/or telephone calls on February 7, 2013, the confidential source arranged to meet Defendant to purchase approximately two ounces of

crystal methamphetamine for $2,200 (Gvt. Exh. 1). The confidential source and Agent Ziesman-Hicks, acting in an undercover capacity, attempted to meet with Defendant to complete the purchase (Gvt. Exh. 1). Defendant was not present at his residence located at 4525 Gillham Road - Apartment 1 when they arrived, however, so no transaction took place on this date (Gvt. Exh. 1; Tr. at 6, 7).

3. On February 8, 2013, the confidential source and Agent Ziesman-Hicks returned to Defendant's residence (Gvt. Exh. 1; Tr. at 7). Once inside, Agent Ziesman-Hicks observed an unknown amount of crystal methamphetamine, at least one methamphetamine pipe and a digital scale (Gvt. Exh. 1; Tr. at 8). She also saw a dark colored backpack containing additional methamphetamine, digital scales and distribution baggies (Gvt. Exh. 1; Tr. at 8).

4. The confidential source and Agent Ziesman-Hicks sat on the couch; Defendant sat in a chair next to Agent Ziesman-Hicks and began smoking methamphetamine (Gvt. Exh. 1). Defendant stated that the methamphetamine he currently had did not have "shards" like the methamphetamine he used to get from other sources (Gvt. Exh. 1). He then passed the methamphetamine pipe to the confidential source and Agent Ziesman-Hicks, who both declined to smoke (Gvt. Exh. 1). Defendant then sold Agent Ziesman-Hicks approximately two ounces of crystal methamphetamine for $2,200 (Gvt. Exh. 1; Tr. at 6).

5. Because Agent Ziesman-Hicks had observed additional methamphetamine at Defendant's residence she arranged a second transaction later that afternoon (Gvt. Exh. 1). Agent Ziesman-Hicks spoke with Defendant and asked if he would "front" her some additional methamphetamine (Gvt. Exh. 1). Defendant informed Agent Ziesman-Hicks to advise her customer to sell what he had and make some money in the next couple of hours and when

Defendant got additional methamphetamine they would talk (Gvt. Exh. 1).

6. Approximately two hours later, Agent Ziesman-Hicks set Defendant a text message that read, "Im 5 min out" (Gvt. Exh. 1). Once inside the residence, Defendant supplied Agent Ziesman-Hicks with an additional four ounces of methamphetamine (Gvt. Exh. 1; Tr. at 6). Agent Ziesman-Hicks paid Defendant $2,950 (Gvt. Exh. 1; Tr. at 8-9). Through subsequent text messages between Agent Ziesman-Hicks and Defendant, Defendant informed Agent Ziesman-Hicks, "Ok, u at 14 (meaning she owed Defendant $1,400) so if u have that and more I might be able to front depends cause I have none avail right now." Agent Ziesman-Hicks responded by texting, "K" (Gvt. Exh. 1; Tr. at 9).

7. On February 15, 2013, Agent Ziesman-Hicks again met with Defendant to obtain crystal methamphetamine (Gvt. Exh. 1; Tr. at 6, 9). She first paid Defendant the $1,400 she owed from the previous transaction (Gvt. Exh. 1; Tr. at 10). Defendant then supplied her with an additional 1.5 ounces of crystal methamphetamine (Gvt. Exh. 1; Tr. at 10). Agent Ziesman-Hicks paid Defendant $1,000 for 1 ounce; Defendant fronted her the additional .5 ounce (Gvt. Exh. 1; Gvt. Exh. 10).

8. On March 22, 2013, Agent Ziesman-Hicks obtained an order for a GPS tracker to be placed on Defendant's vehicle (Tr. at 10-11). She did so because the DEA had lost contact with Defendant as it appeared that he was no longer using his cell phone (Tr. at 11). Based on the coordinate results, agents believed Defendant was continuing to do the same things he had been doing when they initiated the investigation -- specifically, that he did not have a job, was traveling to casinos, going back and forth between residences, and that he was still associated with the Gillham residence (Tr. at 11-12). These activities suggested to Agent

Ziesman-Hicks that Defendant was still selling crystal methamphetamine and that he was not lawfully employed (Tr. at 12, 23).

9. Agent Ziesman-Hicks did not have specific information that Defendant had sold any illegal substances between March 4, 2013 and March 25, 2013 (Tr. at 25).

10. On March 25, 2013, Agent Ziesman-Hicks checked the location of Defendant's vehicle via GPS coordinates (Gvt. Exh. 1; Tr. at 12). Defendant's vehicle was parked outside his residence (Gvt. Exh. 1; Tr. at 13).

11. Agent Ziesman-Hicks decided to conduct a buy/bust operation (Tr. at 13, 61). The plan for the operation was for Agent Ziesman-Hicks to go to Defendant's residence to pay for the methamphetamine he had fronted her on February 15, 2013, and to try to purchase an additional amount (Gvt. Exh. 1; Tr. at 14). Defendant would be arrested regardless of whether Agent Ziesman-Hicks saw observed any methamphetamine (Tr. at 14).

12. At approximately 11:20 a.m., the DEA established surveillance on Defendant's residence (Gvt. Exhs. 1, 2; Tr. at 64). The surveillance team knew of the prior drug transactions that had taken place there (Tr. at 61-62). Surveillance observed two individuals, later identified as Amber Thiele and Steven Rado, enter the residence (Gvt. Exhs. 1, 2; Tr. at 65).

13. At approximately 11:50 a.m., Agent Ziesman-Hicks arrived at the residence (Gvt. Exhs. 1, 2; Tr. at 65). She wore a cell phone with an open microphone so Agent Dorley could hear what was going on inside the residence (Tr. at 15, 62). Agent Ziesman-Hicks knocked on the door and Defendant let her inside (Gvt. Exhs. 1, 2; Tr. at 16, 65). She explained that she wanted to pay for the methamphetamine Defendant fronted her on February 15, 2013, and that the money was in her vehicle (Gvt. Exh. 1; Tr. at 17). She also asked if he had any

additional methamphetamine she could buy that day (Tr. at 17). Defendant responded that he did not but told her to try back in a month because things would be "up and running again, back to normal" (Tr. at 17). Agent Ziesman-Hicks did not observe any contraband in plain view (Tr. at 17, 26).

14. Agent Ziesman-Hicks asked Defendant if he had a screwdriver she could borrow to remove a door panel in her car where she had hidden the money she owed him (Tr. at 18, 27). Defendant provided her a screwdriver and said he would step outside with her to smoke a cigarette (Tr. at 18, 27).

15. At approximately 12:00 p.m., Agent Ziesman-Hicks and Defendant exited the residence (Gvt. Exhs. 1, 2; Tr. at 18, 66). Within a short period of time, she gave the predetermined arrest signal to members of the surveillance team (Gvt. Exhs. 1, 2; Tr. at 19). Defendant was then arrested on the front porch of his residence for the previous controlled buys Agent Ziesman-Hicks had made from him (Gvt. Exhs. 1, 2; Tr. at 19, 67).

16. Due to the fact that the surveillance team had observed two individuals enter the residence shortly before, and because the agents were situated on the front porch of the residence, they conducted a protective sweep of the inside of Defendant's residence for officer safety purposes (Gvt. Exhs. 1, 2; Tr. at 19, 68-69, 88). Individuals from the upstairs apartment could have also entered Defendant's residence (Tr. at 71-74). Upon entering, agents encountered Amber Thiele and Steven Rado sitting on the couch in the living room, which is the room to which the front door opened (Gvt. Exh. 1). Agents took Ms. Thiele and Mr. Rado into temporary custody and for officer safety purposes until the protective sweep was complete (Gvt. Exh. 1).

17. During the protective sweep, agents observed several items in plain sight (Gvt. Exh. 1). In the north, middle bedroom, Agent Dorely observed a methamphetamine pipe with what appeared to be smoked methamphetamine residue on top of the night stand next to the bed (Gvt. Exh. 1; Tr. at 76). Next to the pipe, he observed an empty, small ziploc bag which he knew from training and experience was the size of a ziploc bag commonly used to contain drugs (Gvt. Exh. 1). Agent Dorley saw a black nylon bag lying on the floor next to the bed that contained several clear plastic baggies and an empty pistol holster (Gvt. Exh. 1; Tr. at 76). Agents also observed boxes containing brand new, unopened, high-priced tools or electronics in the living room (Tr. at 75). Due to the large amount of these type of items, the agents called the Kansas City, Missouri Police Department Theft Burglary Squad to check serial numbers and determine if the property was stolen (Tr. at 75).

18. The agents continued their protective sweep of the residence and found a rear bedroom that appeared to be locked from the inside (Gvt. Exh. 1). They obtained a key and opened the room to ensure no one was hiding inside (Gvt. Exh. 1). Upon opening the door, the agents detected a strong and overpowering odor of burnt marijuana (Gvt. Exh. 1). No additional individuals were located and there were no illegal items observed in plain sight (Gvt. Exh. 1).

19. Once the residence was secured, Agent Dorely went to the front porch to speak with Defendant (Gvt. Exh. 1). Agent Dorely asked for consent to search the residence, which Defendant refused (Gvt. Exh. 1).

20. Agents applied for and received a search warrant for Defendant's residence (Gvt. Exh. 1). The application included information about what agents observed during the protective

sweep (Tr. at 21, 78, 94). Agent Ziesman-Hicks testified they would have still applied for a search warrant even if they did not have the information from the sweep (Tr. at 21, 22). The warrant specifically authorized agents

> to search for and seize property that constitutes evidence of the commission of a criminal offense, to wit: marijuana and methamphetamine; firearms, U.S. currency in close proximity to controlled substances; narcotics paraphernalia and any items used in the preparation, packaging and distribution of controlled substances; any papers, correspondence or documents related to drug trafficking and/or the disposition of moneys, which evidence the proceeds from the illicit trafficking of controlled substances; and indicia of occupancy, residency, ownership, management and/or control of the premises described above including, but not limited to utility and telephone bills, cancelled envelopes and keys.

(Gvt. Exh. 1).

21. Agents remained in Defendant's residence while the search warrant was obtained (Gvt. Exh. 2; Tr. at 80, 81-82). They did so for officer safety and to preserve the integrity of the crime scene (Tr. at 82-83). Neither Agent Ziesman-Hicks nor Agent Dorely were aware of any searches of the residence during this time (Tr. at 55, 80).

22. A search of Defendant's residence revealed a HP computer, cell phones, packaging material, bags containing marijuana, bank cards, undetermined cashier's checks, plastic bags containing possible methamphetamine, miscellaneous documents, scales, a case with glass pipes, undetermined U.S. currency, marijuana and a pipe with residue, a digital scale with residue, a Samsung II and jump drive, glass pipes, a nylon bag containing glass pipes, Hollywood casino checks and tax forms, credit cards, a Fed Ex receipt and a LG flat screen television (Gvt. Exhs. 2, 3). The Hewlett-Packard computer was still sealed in the box (Tr. at 48).

23. Agent Ziesman-Hicks testified the computer and television set were seized because agents

believed they had been purchased through drug proceeds due to the fact that Defendant did not have lawful employment (Tr. at 49-50, 56, 58). Defendant had previously told Agent Ziesman-Hicks that he made his living by selling drugs and going to the casino (Tr. at 50). She excluded the possibility that Defendant purchased the computer and television with legitimate funds (Tr. at 51). The DEA has not traced the funds of any drug proceeds to either the computer or television (Tr. at 57-58).

24. Agent Ziesman-Hicks further testified that when executing search warrants, it is the DEA's common practice to seize items of high value that they believe are bought with drug proceeds even if such items are not specified in the warrant (Tr. at 51-52, 56-57, 58).

### III. LEGAL ANALYSIS

Defendant moves to suppress all evidence seized from his residence on March 25, 2013. He specifically contends that his arrest and the protective search were illegal. Defendant further maintains that the search warrant subsequently issued by Judge Maughmer was tainted by these illegalities. Each will be addressed in turn.

**Warrantless Arrest**

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "A warrantless search by an officer is reasonable under the Fourth Amendment 'where there is probable cause to believe that a criminal offense has been or is being committed.'" United States v. Allen, 713 F.3d 382, 386 (8th Cir. 2013)(quoting United States v. Jones, 535 F.3d 886, 890 (8th Cir. 2008)). "Probable cause to make a warrantless arrest exists if 'the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant had committed or is committing an offense.'" Id. (quoting

9

United States v. Torres-Lona, 491 F.3d 750, 755 (8th Cir. 2007)). Previous narcotics purchases can serve as probable cause for a warrantless arrest. United States v. Hinson, 585 F.3d 1328, 1334 (10th Cir. 2009). This is so even when the buy(s) occurred approximately one month prior. See id. (citing United States v. Jeanetta, 533 F.3d 651, 655 (8th Cir. 2008)("Standing alone, the fact the controlled buy was made two weeks before the warrant issued does not render the information in the application stale.")).

In this case, probable cause existed for the agents to make a warrantless arrest. Agent Ziesman-Hicks had received information from a confidential source that Defendant was a large scale distributer/supplier of crystal methamphetamine who distributed approximately six pounds of methamphetamine a week. Agent Ziesman-Hicks personally purchased methamphetamine from Defendant on both February 8, 2013 and February 15, 2013. Results from the GPS tracker suggested to Agent Ziesman-Hicks that Defendant was continuing to sell methamphetamine. When Agent Ziesman-Hicks showed up at Defendant's residence on March 25, 2013, she did so under the guise of paying Defendant for the methamphetamine he had fronted her on February 15, 2013. They also discussed Agent Ziesman-Hicks purchasing an additional amount of methamphetamine and Defendant told her to return in a month. These events are sufficient to lead a reasonable person to believe that Defendant had committed a drug trafficking offense. Defendant's arrest was constitutional.

**Protective Sweep**

The Fourth Amendment permits a protective sweep "to protect the safety of police officers or others [that is] narrowly confined to a cursory visual inspection of those places in which a person may be hiding." United States v. Green, 560 F.3d 853, 856 (8th Cir. 2009)(quoting Maryland v.

Buie, 494 U.S. 325, 337 (1990)). "A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers." United States v. Davis, 471 F.3d 938, 944 (8th Cir. 2006). Law enforcement officers are also permitted to conduct a protective sweep "pending an application for a search warrant when there is a risk that evidence will be destroyed." United States v. Jansen, 470 F.3d 762, 766 (8th Cir. 2006).

Here, Defendant was arrested on his front porch. The front door to his apartment was ajar, and agents knew that at least two other individuals were inside the residence. They were also aware of the previous drug transactions that had taken place at the residence. Agents swept only Defendant's apartment, and confined the sweep to places where individuals may be hiding. After doing so agents stayed in the living room with Ms. Thiele and Mr. Rado both for officer safety and to preserve the integrity of the scene. The law does not preclude the agents from remaining inside Defendant's residence until a warrant was obtained. See, e.g., United States v. Rothermich, No. 4:09CR815 ERS (FRB), 2010 WL 1936011 at *7 (E.D. Mo. Apr. 30, 2010). Defendant's motion to suppress should be denied on this ground.

**Warrant**

Lastly, Defendant argues that the search warrant issued by Judge Maughmer was tainted by the items viewed by in plain view during the protective sweep. This argument is without merit. As discussed above, both Defendant's arrest and the protective search of his residence were lawful. I do agree, however, with the point raised by Defendant during the suppression hearing that the HP computer and flat screen television should not have been seized. The warrant authorizing the search of Defendant's residence did not specify computers or televisions among the items to be seized, nor

11

did it include items believed to be purchased through drug proceeds. Although Agent Dorley testified that the Kansas City, Missouri Police Department was called to determine if high-priced, electronic items were stolen, the record does not contain any evidence as to whether the computer and television fell within this category and/or if it was ultimately determined that they were stolen. As a result, lawful seizure of the unopened computer and flat screen television "must satisfy an exception to the warrant requirement." United States v. Scott-Kelley, No. CR-10-190 JNE/SRN, 2010 WL 5559758 at *16 (D. Minn. Nov. 9, 2010). See also United States v. Crozier, 777 F.2d 1376, 1381 (9th Cir. 1985)("Only those items which fall outside the scope of the warrant need by suppressed."); United States v. Turley, 830 F. Supp. 547, 549 (D. Kan. 1993). I do not find that the computer or television fall within any of the exceptions and thus recommend they be suppressed.

Furthermore, I find Agent Ziesman-Hicks' testimony that it is the DEA's common practice to seize high-value items not included in a search warrant to be particularly troubling. Absent judicial authority or satisfaction of an exception to the warrant requirement, the DEA has no Fourth Amendment justification to seize these types of items and should discontinue this practice immediately.

### IV. CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order granting in part and denying in part Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless

an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                          */s/ Robert E. Larsen*
                                          ROBERT E. LARSEN
                                          United States Magistrate Judge

Kansas City, Missouri
September 23, 2013